Filed 6/22/22  P. v. Johnson CA4/1
Opinion following transfer from Supreme Court

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D075649 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD267741) |
| MARLON JOHNSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Runston G. Maino, Judge.  Affirmed in part; remanded with directions.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Charles C. Ragland, Assistant Attorneys General, Eric A. Swenson, Kristine A. Gutierrez, Allison V. Acosta, and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Marlon Johnson of two counts of second degree murder (Pen. Code,[1] § 187, subd. (a); counts 1 and 2); and unlawful discharge of a firearm at an occupied motor vehicle (§ 246; count 3).[2] The jury found true that regarding counts 1 and 2, Johnson: (1) personally used a firearm (handgun) within the meaning of sections 12022.5, subdivision (a) and 12022.53, subdivision (b); (2) personally used and intentionally discharged a firearm (handgun) within the meaning of section 12022.53, subdivision (c); and (3) personally used and intentionally discharged a firearm (handgun) proximately causing great bodily injury and death within the meaning of section 12022.53, subdivision (d). Regarding count 3, the jury also found Johnson personally used and intentionally discharged a firearm (handgun) proximately causing great bodily injury and death within the meaning of section 12022.53, subdivision (d).[3]

The court sentenced Johnson to prison for an indeterminate term of 105 years to life plus a determinate term of 7 years.

Johnson appealed, contending the five and a half year delay in charging Johnson violated his right to due process; the admission of prejudicial

---

[1] Statutory references are to the Penal Code unless otherwise specified.

[2] The jury returned a verdict on count 2 after it was unable to reach a verdict on the charge of first degree murder. The prosecutor withdrew the first degree murder allegation as to count 2 and asked the jury to engage in further deliberations on count 2 for second degree murder. The court granted the prosecutor's request. After resuming deliberations, the jury reached a verdict on count 2.

[3] This was the third jury who heard the evidence presented against Johnson. The first jury was unable to reach a verdict, and the trial court declared a mistrial. A second jury acquitted Johnson of first degree murder on count 1 and was unable to reach a verdict on second degree murder on count 1 as well as the other two counts. The trial court therefore declared a mistrial at Johnson's second trial.

hearsay evidence and improper expert opinion rendered his trial fundamentally unfair; his trial counsel was constitutionally ineffective; the matter must be remanded to allow the trial court to exercise informed discretion to strike Johnson's firearm enhancements; and the abstract of judgment must be amended to accurately reflect Johnson's custody credits.

In an unpublished opinion, we concluded Johnson's claims lacked merit, except for agreeing that the abstract of judgment must be corrected. As such, we remanded the matter to the superior court with directions to calculate the accurate number of custody credits and correct the abstract of judgment accordingly. However, our high court granted Johnson's petition for review and ultimately transferred the matter back to us with directions to vacate our previous opinion and reconsider the cause in light of *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*).

We have complied with the California Supreme Court's instructions and considered Johnson's claims taking into account *Tirado*. Accordingly, we agree with Johnson that this matter should be remanded to the superior court to allow it to exercise its new discretion to strike the firearm enhancements. In addition, the superior court needs to calculate the correct custody credits and prepare a revised abstract of judgment according to any changes in Johnson's sentence and ensure that that abstract correctly reflects the trial court's oral pronouncement of judgment. In all other respects, we affirm the judgment.

## FACTUAL BACKGROUND

On January 9, 2011, at some point after 8:00 p.m., Keith B. and Daryl H. left Stacie S.'s house, so Keith could walk Daryl to the bus stop. Several neighbors as well as others who were out in the neighborhood noticed Keith and Daryl at the street corner. They also saw a third man near the

3

street corner and sensed a tense situation. One person saw the third man leaning over a car and facing the victims. Another saw the victims and the third man walking toward each other. A different witness saw the three men arguing and noticed that the third man was in a parking space.

At about 8:39 p.m., Stacie and numerous neighbors and passersby heard multiple gunshots. As the third man in the parking space fired a gun, Daryl immediately fell to the ground, and Keith tried to run away. Stray ammunition rounds shattered the window of a car that was driving by at that time. The shooter ran away, with the gun in his hand, toward a white Monte Carlo parked nearby. Several neighbors heard the car start and saw it immediately drive away.

Keith arrived back at Stacie's door bleeding and told her to call the police. She called the police at 8:41 p.m. Keith died of a gunshot wound.

Daryl also was shot. A nurse practitioner, who lived in the area, provided medical aid to Daryl until paramedics arrived, but he suffered so many gunshot wounds that the nurse could not control the bleeding. Daryl died as a result of multiple gunshot wounds.

The round that struck a car as it drove by caused the driver, Nadia A., to have cuts on her forearms and chest and glass shards and a metal fragment in her chin.

No weapons were recovered from the scene of the shooting or Stacie's apartment. The police recovered eight nine-millimeter cartridge casings, a bullet fragment, and several cigarette butts from the area where witnesses said the shooter had been located. They recovered a bullet and a bullet fragment from Nadia's car and a bullet from another car parked in the area. The cartridge casings were all fired from the same gun, and the bullets and metal fragments were fired from the same gun. However, without the gun

4

itself, it was not possible to determine if the cartridge casings, bullets, and metal fragments were all fired from the same gun. An accident reconstructionist opined that the bullet that shot Keith passed through Keith's body before striking Nadia's car.

Daryl's blood alcohol concentration was .19, and Keith's was .18, and they both tested positive for marijuana. In his pocket, Daryl had a bus schedule and bus pass.

The owner of the white Monte Carlo, April P., lived in an apartment near where the shooting occurred. She was in a relationship with Johnson at the time of the shooting. Johnson regularly stayed at her apartment, and on the evening of the shooting, he had dropped her off at a family event and was driving her car. The Monte Carlo was parked near April's apartment right before the shooting.

An analysis of Johnson's cell phone records and location data showed that in the minutes immediately before and after the shooting, he made several phone calls to Abdul H. at 8:34, 8:45, and 8:48 p.m. During that time, his phone was using cell towers near where the shooting occurred. By 8:42 p.m. (about the same time that the first 911 call was placed about the shooting), Johnson's cell phone was moving to the area where Abdul H. lived.

Johnson's DNA was on the cigarette butts recovered from the crime scene.

At 9:19 p.m., Johnson arrived at the bar where April was located. He parked behind the bar and waited for April to come outside to him. When she got in the car, she noticed he was agitated. He explained that he "got[] into it with a couple of guys" and asked her to drop him off at a friend's house. She went back inside the bar to collect her purse and tell her friends where she was going, and Johnson had her drop him off in a residential area. At

5

9:26 p.m., Johnson called Ale'ishia H., the mother of his child, who lived near where April dropped him off.

When April returned to the bar, she told her friend Jennifer P. that Johnson had shot two people and that she wanted to go to a different bar. Shortly thereafter, they learned from another friend that the shooting occurred outside of April's apartment complex.

Over the course of the next two weeks, Johnson stayed with April's family members and Ale'ishia's family members. Johnson also stayed one night in a hotel with April in a room reserved under her name.

When the police came to April's apartment, she lied and said she lived alone, that she had the Monte Carlo at the time of the shooting, and that she dropped Johnson off at some other location than where she did. The police interviewed April a second time at her mother's house, and she gave a different version of events. April later retained an attorney and provided the account she gave in court.

On January 13, 2011, a detective called Johnson's phone number, but when the detective identified himself, the person on the other end hung up. On January 14, Johnson left another detective a voicemail but did not leave his contact information. After Johnson moved out of Ale'ishia's family's house, Ale'ishia gave the police permission to search it. Jennifer did not tell the police what April had told her at the bar until several years later.

The police tried to locate Johnson by investigating contacts from his cell phone and monitoring April and Ale'ishia. Their efforts, however, proved unsuccessful.

When the police were unable to locate Johnson, they contacted the Law Enforcement Communications Center (LECC) for assistance. They also put information into the Officer Notification System so that any law enforcement

officer who might encounter Johnson would know that the San Diego Police Department needed to speak with him. Based on information they received, the San Diego Police Department asked the police in England, Arkansas to look for Johnson at several addresses. There is no indication that the police in Arkansas were able to locate Johnson at that time.

In 2016, the case came to the attention of the San Diego Police Department's cold case homicide team. A detective went to England, Arkansas and obtained a phone number that he believed belonged to Johnson's wife. He called and spoke to her, did not mention that he was a police officer, and asked her to have Johnson call him back. Johnson did so, but he refused to meet with the detective in person. He denied any knowledge about the shootings, claimed not to know April or anything about a Monte Carlo, and said he was not in San Diego at all in 2011.

The detective began working with the San Diego District Attorney's Office to obtain an arrest warrant. Johnson was arrested in Arkansas shortly thereafter.

DISCUSSION

I

JOHNSON'S MOTION TO DISMISS FOR PREJUDICIAL DELAY

A. Johnson's Contentions

The murders in this case occurred on January 9, 2011. Johnson, however, was not charged until July 7, 2016—some five and a half years later. He contends the trial court violated his state and federal rights to due process and a fair trial by denying his motion to dismiss the charges against him. The basis of Johnson's motion was that his due process rights were violated due to a prejudicial and unjustified prosecutorial delay in charging him.

7

## B. The Investigation

Detective Wendy Valentin and the other detectives on the case initially came to the scene and worked for 23 hours to document the crime scene, interview witnesses, and locate the white Monte Carlo. On January 11, two days after the shooting, they seized the vehicle and spoke with April at her apartment. Later that day, they searched April's apartment. In the days that followed, they continued interviewing witnesses and gathering evidence. They repeatedly visited locations like April's apartment, her mother's home, and Johnson's friends' homes in an effort to locate Johnson.

On February 1, April provided additional information about the bar she had been at on the night of the shooting, the location where she had taken Johnson, and the hotel where she and Johnson had stayed after the shooting. The detectives contacted those places to corroborate her account. They interviewed additional witnesses, including Johnson's own family members, in an effort to locate him. However, they were not able to locate Johnson through his family members and friends. And with each person a detective contacted about Johnson, he or she would leave a business card and ask them to call the number if there was any contact with Johnson. The detectives also located Ale'ishia on February 15 and visited her several times over the following months.

In the months that followed the shooting, the homicide team became very busy with numerous other cases. For investigative assistance, the police contacted the LECC. The LECC continued checking various databases to locate Johnson and received information tying Johnson to several addresses in Oklahoma and Arkansas. However, they did not locate Johnson at any of those addresses. The police also put Johnson's information into the Officer

Notification System. They pursued leads and worked with the police in England, Arkansas, but they did not locate Johnson.

Detective Bruce Pendleton, from the cold case team, testified that a case is considered "cold" when it goes unsolved for five years. The key difference between homicide teams and cold case teams is that homicide teams are constantly on call to investigate new cases, whereas cold case teams have "no time constraints" to work a case.

The cold case team began investigating this case in 2016. Pendleton determined that he needed to talk to Johnson because he was the primary suspect. Pendleton recalled that a person who worked in the LECC had been trying to locate Johnson. Pendleton had "some information" that Johnson had been in Oklahoma City, Texas, and Arkansas "through the years." One of the locations at which Pendleton believed Johnson could reside was England, Arkansas. Thus, Pendleton contacted a police lieutenant in England, Arkansas to see if the lieutenant was familiar with Johnson or Johnson's family. The lieutenant was familiar with Johnson; so, Pendleton flew to Arkansas with another detective in May 2016.

Once in England, Arkansas, Johnson met with local police and "did a bunch of computer runs . . . looking for local contacts, traffic cites, or field interviews for Mr. Johnson." But none were found. However, a source provided Pendleton with a "lead" on Johnson's wife's cell phone number.

When the other detective flew back to San Diego, Pendleton remained in Arkansas. He traveled to Little Rock and worked with Pulaski County Sheriff's Office, where he met with a detective who assisted him in running additional computer checks on Johnson. Yet, Pendleton still failed to locate Johnson.

Finally, Pendleton called the cell phone number of Johnson's wife and when she answered, he identified himself only as Bruce and asked to speak with Johnson. Johnson's wife did not put Johnson on the phone with Pendleton, but about 15 minutes later, Johnson called Pendleton. During that call, Pendleton identified himself as a detective sergeant with the San Diego Police Department cold case homicide team. Pendleton then told Johnson he was investigating a double homicide that occurred in San Diego in 2011. Johnson did not want to meet with Pendleton in person but agreed to having another call.

In the subsequent telephone conversation between Johnson and Pendleton, Pendleton informed Johnson about the specifics of the double homicide—it happened on January 9, 2011 at 30th and C street, the suspect was seen getting into a white Monte Carlo that belonged to April, Johnson's former girlfriend. Johnson claimed that he did not know April and had never driven a white Monte Carlo. Johnson also told Pendleton that the last time he was in San Diego was 2009 or 2010. Johnson also refused to give Pendleton his home address in Arkansas.

Pendleton then interviewed Johnson's mother, but he was unable to discover Johnson's home address. Fearing Johnson might flee Arkansas, Pendleton returned to San Diego, presented the case to the District Attorney's Office, and obtained an arrest warrant for Johnson. Johnson was arrested in late July 2016.

An investigator for the San Diego District Attorney's Office, Sandi Oplinger, became involved in the case in June 2016, the month before Johnson was arrested. She explained that part of her role is to look at a case "with fresh eyes," talk to witnesses who have not been interviewed before,

and retest evidence if science has progressed since the evidence was originally tested.

Oplinger read every report and listened to every audiotape relating to the subject homicides. Based on the information in the file, she decided to reinterview some witnesses who might have more information than what was in their original statements. She also worked to clarify other ambiguities in the investigation.

During her investigation, Oplinger discovered that a person identifying himself as "Will" called the police from a nearby gas station right after the shooting, but he did not provide his full name or contact information. Will did not remain in the area after his call, and Oplinger stated she had no way to contact him. Also, in reviewing the contents of Will's call, Oplinger noted that Will's description of the shooting was inconsistent with the physical evidence. For example, Will said the shooter exited a gold SUV and that there was gunfire from more than one direction.

When Oplinger reinterviewed Jennifer, Jennifer informed her that when she was at the bar with April on the night of the shooting, April told her Johnson had shot two people and explained she had not originally reported the statement because she believed April was cooperating with law enforcement and had given the police that information.

C. Johnson's Motion to Dismiss

Before trial, Johnson filed a motion to dismiss the charges against him based on unjustified prosecutorial delay. In that motion, he argued the five and a half year delay between the date of the homicides and when he was charged violated his due process rights. Johnson claimed he was prejudiced by the delay because: (1) he suffered "prolonged anxiety and concern" and (2) his defense was impaired because of "dimming memories and loss of

11

exculpatory evidence." Specifically, he maintained that the prosecution failed to preserve evidence of other individuals who were present in the apartment on the night of the shooting. In addition, Johnson asserted that law enforcement did not preserve or test certain men's clothing found in April's apartment or identify April's alleged former roommate. Also, he claimed that law enforcement did not investigate April's online activities.

Johnson further claimed he was prejudiced by faulty witness memories and law enforcement's failure to find "Will," an alleged eyewitness to the shootings who had called 911. Finally, Johnson asserted that law enforcement did not timely interview another eyewitness, Antonio R. Instead of interviewing Antonio shortly after the shootings, law enforcement did not interview him until January 25, 2017.

In opposition, the prosecution argued that Johnson's motion was premature and should await the results of trial. In the alternative, the prosecution contended that Johnson could not show prejudice and there was no precharging delay.

After considering the motion and opposition to the motion as well as entertaining oral argument, the trial court denied Johnson's motion. In doing so, the court stated it believed Johnson "made huge efforts to avoid the police until they finally located him years later." The court further noted that "it's absolutely clear that the defendant fled, knowing the police wanted to talk to him and- or arrest him." The court also appeared to be skeptical that Johnson articulated any actual prejudice attributable to the delay.

D. Applicable Law

The due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution protect a defendant from the prejudicial effects of lengthy,

12

unjustified delay between the commission of a crime and the defendant's arrest and charging. (*People v. Cowan* (2010) 50 Cal.4th 401, 430 (*Cowan*); *People v. Nelson* (2008) 43 Cal.4th 1242, 1250 (*Nelson*).) When, as here, a defendant does not complain of delay after his arrest and charging, but only of delay between the crimes and his arrest, he is "not without recourse if the delay is unjustified and prejudicial. '[T]he right of due process protects a criminal defendant's interest in fair adjudication by preventing unjustified delays that weaken the defense through the dimming of memories, the death or disappearance of witnesses, and the loss or destruction of material physical evidence.' [Citation.] Accordingly, '[d]elay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal Constitutions. A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay. The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay.' [Citation.]" (*Nelson, supra*, at p. 1250; see *People v. Mirenda* (2009) 174 Cal.App.4th 1313, 1327-1329 (*Mirenda*).)

In *Nelson, supra*, 43 Cal.4th 1242, our high court explained that "[t]he state and federal constitutional standards regarding what justifies delay differ" and, although "the exact standard [for due process violations] under [the federal] Constitution is not entirely settled[, i]t is clear . . . that the law under the California Constitution is at least as favorable for the defendant in this regard as the law under the United States Constitution." (*Id.* at p. 1251.) The court concluded that "under California law, negligent, as well as purposeful, delay in bringing charges may, when accompanied by a showing of prejudice, violate due process." (*Id.* at p. 1255; *Mirenda, supra*,

13

174 Cal.App.4th at p. 1328.) However, a due process violation " 'claim based upon the federal Constitution also requires a showing that the [prearrest] delay was undertaken to gain a tactical advantage over the defendant.' " (*Nelson*, at p. 1251.)

The court in *Nelson* also observed that "whether the delay was negligent or purposeful is relevant to the balancing process. Purposeful delay to gain an advantage is totally unjustified, and a relatively weak showing of prejudice would suffice to tip the scales towards finding a due process violation. If the delay was merely negligent, a greater showing of prejudice would be required to establish a due process violation." (*Nelson*, *supra*, 43 Cal.4th at p. 1256; see *Ibarra v. Mun. Court* (1984) 162 Cal.App.3d 853, 858 ["[T]he more reasonable the delay, the more prejudice the defense would have to show to require dismissal."].)

Although a minimal showing of actual prejudice may require dismissal if the proffered justification for the prearrest delay is insubstantial, by the same token, the more reasonable the delay, the greater the prejudice the defense must show to require dismissal. (*Mirenda, supra*, 174 Cal.App.4th at p. 1327; see *People v. Conrad* (2006) 145 Cal.App.4th 1175, 1185.) However, the court need not engage in the balancing process if the defendant has failed to meet his or her initial burden of showing actual prejudice since there is nothing against which to weigh such justification. (*Mirenda*, at pp. 1327-1328.)

Prejudice may be shown by " 'loss of material witnesses due to lapse of time [citation] or loss of evidence because of fading memory attributable to the delay.' " (*People v. Catlin* (2001) 26 Cal.4th 81, 107, quoting *People v. Morris* (1988) 46 Cal.3d 1, 37.) "We review for abuse of discretion on a trial court's ruling on a motion to dismiss for prejudicial prearrest delay [citation],

14

and defer to any underlying factual findings if substantial evidence supports them [citation]." (*Cowan, supra*, 50 Cal.4th at p. 431.)

### E. Analysis

We conclude the trial court did not abuse its discretion in denying Johnson's motion to dismiss. Here, in discussing prejudice, Johnson focuses on the circumstantial nature of the prosecution's case against him. He emphasizes that no eyewitness identified him as the shooter. He notes there was no forensic evidence linking him to the crimes. Johnson correctly decrees that the murder weapon was never found. However, simply pointing out the weakness in the prosecution's case does not establish that Johnson was prejudiced by the delay.

That said, Johnson argues it is important that we appreciate that the prosecution's case against him was based only on circumstantial evidence to properly understand how he was prejudiced by the delay. Specifically, he claims his prejudice "is reflected by a series of losses, i.e., what the defense could not do and what the defense lost as a result of the delay as well as not obtaining receipt of the state's discovery until some five and a half years after the shooting, post filing." Yet, to prevail, Johnson must do more than merely point at the passage of time and conclude evidence was lost. (Cf. *Crockett v. Superior Court* (1975) 14 Cal.3d 433, 442.) He must identify specific evidence that he believes was lost, not speculate that he was prejudiced because

15

potential witnesses' memories have faded or certain witnesses and evidence were made unavailable. (See *Shleffar v. Superior Court* (1986) 178 Cal.App.3d 937, 946.) It is this burden that Johnson cannot satisfy.

Johnson does not argue any material witness who was available in 2011 was not available for trial. Instead, he claims that if the police had searched for Will sooner, they might have found him, and his testimony would have been exculpatory.

Nevertheless, Johnson's inability to produce a witness that he claims is necessary to his defense does not automatically entitle him to dismissal of the charges. (*People v. Kirkpatrick* (1972) 7 Cal.3d 480, 486.) And Johnson has not shown that the police would have located Will if they had searched for him sooner. (See *Cowan*, *supra*, 50 Cal.4th at p. 434 [because the subject evidence was missing shortly after the crime, "a more prompt prosecution would not have benefited defendant" unless it was initiated before that point]; *People v. Abel* (2012) 53 Cal.4th 891, 910 ["Defendant has not shown [his investigator] would have found additional records had the investigation proceeded more quickly"].) Indeed, although he called the police, Will did not leave his full name or any contact information. As such, the police had very little information to aid them in tracking down Will.

In addition, the content of Will's call was discussed at trial. As Oplinger, explained, Will's account was inconsistent with the evidence at the scene, which indicated there was only one shooter not multiple shooters as Will described. Further, Will was the only eye witness who claimed to see a gold SUV at the scene of the crime. Johnson does not argue that Will could have provided other evidence about the shooting at the trial beyond the content of his call to the police.

16

Additionally, Johnson has not shown that any witnesses were unable to remember material facts. To the contrary, Johnson claims here that he was prejudiced because some witnesses' memories "miraculously got better" over the five and a half year delay. Yet, Johnson admits that, in the five years since the shooting, law enforcement located and interviewed two witnesses who provided details that were, in some respects, helpful to his defense. For example, Antonio had provided the police with his contact information at the scene of the shooting, but he was not interviewed until 2017. When he testified at trial, Antonio had little memory of the event, but he did recall previously stating that there was a truck involved in the shooting. However, he also believed the shooting occurred during the day and described the shooter being in a location that was inconsistent with the physical evidence and the testimony of other witnesses.

Similarly, another trial witness, Drew G., had called 911 in 2011, but was not interviewed until 2016. At the time of his interview, Drew could only identify the general location of the shooter, not the specific place where the physical evidence indicated the shooter stood. In his 911 call, he had described the shooter as Hispanic or African American, but at the time of his trial testimony, he believed the shooter was Hispanic. At least as to these two witnesses, Johnson did not show any likelihood that they would have recalled details any better for the defense had he been arrested sooner. (See *Shleffar v. Superior Court, supra,* 178 Cal.App.3d at p. 946 [speculation about prejudice is insufficient to discharge the defendant's burden].) On this record, we are satisfied that substantial evidence supported the trial court's finding that Johnson did not show he was prejudiced by the delay.

Moreover, Johnson discounts that his trial counsel was able to cross-examine all trial witnesses and probe their fading memories and impeach

17

them with their inconsistencies. And defense counsel questioned the police officers, detectives, and investigators about the investigation of Will's call. Thus, on the record before us, if there was prejudice, defense counsel was able to minimize it. (See *Cowan*, *supra*, 50 Cal.4th at p. 434 ["defense counsel was able to exploit the destruction of this evidence by pointing out, . . . that it had never been examined" and "any prejudice from the loss of evidence was minimal"].)

Even assuming Johnson established actual prejudice from the precharging delay that occurred, the law is clear that "the executive branch has broad discretion when it comes to deciding how to allocate scarce investigative resources and when to file criminal charges in a particular case. [Citations.]" (*People v. Booth* (2016) 3 Cal.App.5th 1284, 1309 (*Booth*).) Indeed, absent evidence the police or prosecutors were negligent or intentionally dilatory in terms of handling an investigation, courts are loath to second-guess when charges should have been brought in a particular case. (*Ibid.*)

Here, Johnson contends police exercised little effort to track him down although they knew, within two days of the homicides, that April owned the Monte Carlo, and after talking to her, they knew about Johnson. In this sense, Johnson implies that he could have been easily found had the police exerted minimal effort. The record does not support that argument.

To the contrary, the police diligently attempted to track down Johnson. They talked to April and Ale'ishia as well as Johnson's family members and other friends. During this time, the record indicates that Johnson was avoiding the police. Johnson avoided any location where the police were looking for him, including April's apartment and eventually April's mother's house. He even stayed in a hotel one night. When a detective called

18

Johnson's number and identified himself, the person on the other end of the phone hung up. Johnson did return another detective's call, but he did not leave his contact information. Then, for five years, Johnson avoided creating any significant transactions or records that might enable the LECC to locate him. When a detective finally spoke to him on the phone, Johnson refused to meet in person. Against this backdrop, it is difficult to cast blame on the police or assume they were negligent in failing to arrest Johnson when Johnson clearly was avoiding the police. (See *People v. Perez* (1991) 229 Cal.App.3d 302, 313 ["[T]he fugitive, having done all he or she can do to avoid being brought to justice, cannot then claim the denial of the right to speedy trial resulted from the ensuing delay"].) Further, Johnson left the jurisdiction to avoid prosecution. Under that circumstance, the prosecution, generally, is not accountable for the delay. (*Id.* at p. 314.)

Moreover, the police department's limited resources also contributed to the delay. The necessity of allocating prosecutorial resources may cause valid delays. (*Nelson*, *supra*, 43 Cal.4th at pp. 1256-1257.) "It is not enough for a defendant to argue that if the prosecutorial agencies had made his or her case a higher priority or had done things a bit differently they would have solved the case sooner." (*Id.* at p. 1257.) Here, the homicide team became very busy with other homicide cases in the months after this shooting took place. The police utilized other resources, including the LECC and Officer Notification System. However, it was not until the cold case team took over in 2016 that the police had the time to focus exclusively on this case without competing obligations in other cases. With the additional time, the police located and arrested Johnson within a matter of months.

On the record before us, we agree with the trial court that there was a strong justification for the precharging delay that occurred. (*Booth*, *supra*,

19

3 Cal.App.5th at p. 1309.)  Balancing that justification against the weak-to-nonexistent showing of prejudice Johnson put forth, the trial court properly denied his motion to dismiss.  No abuse of discretion or cause for reversal has been shown.

II

Oplinger's Testimony

A.  Johnson's Contentions

Johnson challenges several portions of Oplinger's trial testimony.  He argues that Oplinger testified about "vast amounts of hearsay," vouched for the credibility of witnesses, removed material issues from the jury, and offered improper expert opinion.  As the People point out, Johnson's trial counsel did not object to much of the testimony of which Johnson now complains.  Thus, the trial court was not presented with timely and specific objections, and the prosecution was not given the opportunity to respond to any objections that the court sustained.  Accordingly, as we explain *post*, we conclude Johnson forfeited his claims on these issues here.

B.  Background

Not surprisingly, a major issue at Johnson's trial was the time that transpired between when the crimes were committed and when he was arrested.  The prosecution therefore called witnesses to explain the investigation of the two homicides and address the delay in arresting Johnson.  One such witness was Oplinger, an investigator with the District Attorney's Office.

Oplinger testified about her investigation of the case beginning in 2016.  Because her investigation began several years after the crimes were committed, she brought "fresh eyes" to the case. Her job was to corroborate details, talk to witnesses who had never been interviewed, and determine

20

whether evidence needed to be tested again. As part of her investigative role, she was tasked with identifying inconsistencies in the evidence and trying to reconcile them. In doing so, she reviewed 3,000 pages of material, including every police report and audio recording. Yet, she did not reinvestigate the entire case or reinterview every witness. Instead, she assessed whether witness statements appeared to be "accurate" or whether witnesses appeared to have "essential information." When she decided to reinterview witnesses, her purpose was to "see if they remember what they had said," obtain more details, or to clarify ambiguous descriptions.

For example, Oplinger explained that one of the witnesses, Celestina O., originally reported that the victims were approaching Johnson "in a threatening manner," and she reinterviewed her to gain a better understanding of what caused Celestina to describe the victims' approaches as threatening. Celestina told Oplinger that the victims were walking swiftly, that Johnson was walking toward the victims at a slower pace, and that she did not observe any weapons. Johnson's trial counsel did not object to this testimony.

During her investigation, Oplinger discovered that Drew had called 911 as an eyewitness but had never been interviewed. While testifying at trial, Oplinger briefly summarized her interview of Drew. Oplinger testified that Drew marked, on a diagram, the approximate location where he recalled the shooter standing, and Oplinger observed that the exact location he marked was not consistent with the physical evidence, but the general vicinity was consistent with the evidence. She based her opinion on the location where the shell casings were found and the trajectory of the bullet that struck the van. Defense counsel did not object to this portion of the testimony.

In addition, Oplinger noticed that Rebecca Z., the girlfriend of eyewitness Richard R., told the police that Richard had seen a man with a gun getting into a car, but when Richard was interviewed, he left out that detail. So, she interviewed both Rebecca and Richard again and obtained additional information. Oplinger also testified that she believed Richard's statement was consistent with statements from two other eyewitnesses' respective statements as well as the physical evidence. Although defense counsel objected to portions of Oplinger's testimony about her interview of Richard on the grounds of that evidence was misstated and a question was leading, he did not object on hearsay grounds to this portion of Oplinger's testimony.

However, Johnson's trial counsel objected to a subsequent portion of the Oplinger's testimony when she discussed some of the physical evidence at the scene. The subject testimony was as follows:

"Q. [Drew's] statement, as you've testified to, was that he saw one man with a gun. Is that consistent with [Richard's] statement that there was one man with a gun?

"A. Yes.

"Q. Is that consistent with the physical evidence that there was one gun at this crime scene?

"A. Yes. We have eight nine-millimeter shell casings that all match together. We have the missiles that were recovered from the scene that all came from one gun. The firearms expert can't compare the missiles --

"[Defense Counsel]: I'm going to object to the witness testifying as to what the expert can testify to. She answered the question.

"[THE COURT]: I think she answered the question. The witness is testifying as an expert, and you'll get an

22

> instruction on experts. You can accept an opinion. You can reject it. You can give it some weight, great weight, whatever you want."

Oplinger also explained why she did not attempt to find "Will." She testified that Will did not leave enough identifying information to allow her to find him. She also noted no police officer contacted Will previously. When the prosecutor followed up on Oplinger's statement that police had not talked to Will by beginning to ask, "[E]ven though there was no way to contact him—" defense counsel objected on the grounds the prosecutor was leading the witness and misstating the evidence. The court overruled the objection. Oplinger continued to testify that Will's account was inconsistent with all of the evidence she had reviewed.

Oplinger additionally explained that she located Antonio, who had not been interviewed near the time the homicides were committed. Over defense counsel's hearsay objection, the court determined that Antonio's statements were admissible for the limited purpose of showing whether the case was diligently investigated and "whether or not the information [Oplinger] relied on [wa]s reliable information, why she has an opinion as to what happened." Oplinger thus summarized Antonio's statement and opined that it was inconsistent with the other evidence "based on where . . . the shooter came from and the direction of the shots being fired."

As an example of additional testing, Oplinger explained that she had a blood trail from the scene tested for DNA to confirm that it was Keith's blood.

Oplinger also testified that April was not cooperative during the investigation, adding, "I know after reading the reports that the prior detectives had done that she lied twice to law enforcement and she wasn't, I

23

don't think, a hundred percent forthcoming in her third interview on February 1st." She then detailed her failed efforts to interview April again. Johnson's trial counsel did not object to this portion of Oplinger's testimony.

## C. Analysis

Here, Johnson challenges Oplinger's testimony with a broad brush. He claims Oplinger's "testimony was a blatant misuse of expert testimony, usurped the duties of the factfinder, and essentially vouched for Oplinger's credibility and that of key prosecution witnesses in this case while undermining witnesses that may have benefited the defense like 'Will' and [Antonio]." As such, Johnson argues that Oplinger offered improper expert opinions and commented on the veracity of witnesses. Yet, he does not point to anywhere in the record where he made such objections at trial.

We observe that Johnson's trial counsel did object to Oplinger's testimony when she tried to explain that the firearm expert could not compare various bullets and casings. However, that objection was aimed at Oplinger's attempt to discuss what another expert could testify to: "I'm going to object to the witness testifying as to what the expert can testify to. She answered the question." And the court agreed with defense counsel, and Oplinger never finished explaining what the firearms expert could not testify about. That said, defense counsel was not objecting to Oplinger opining about whether another witness's statement was consistent with other witnesses' statements or the physical evidence. Further, Johnson points to no other objections in the record as to the scope of Oplinger's testimony or any other opinions that she offered.

In addition, although Johnson's trial counsel did object to Oplinger's testimony about Antonio's statements on hearsay grounds and the trial court

24

overruled that objection, on appeal, he does not explain why this was error. Instead, Johnson lumps Antonio's statements with statements of other witnesses to which no objections were made. He then argues that none of the statements should have been admitted at trial. In this sense, he fails to adequately explain why the court erred in overruling the one hearsay objection made at trial that is relevant to his appeal.

In short, Johnson tries to challenge much of Oplinger's testimony here, primarily because he claims it improper expert opinion and/or hearsay, but he did not make such objections below. As such, he has forfeited these contentions in the instant matter. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 19-20.) Forfeiture is especially appropriate on the record before us because Oplinger was testifying, in part, to explain the delay in arresting Johnson and what she did when she began to investigate this case in 2016. By failing to object at trial, Johnson denied the prosecution the opportunity to correct any of the errors he now claims occurred. (See *People v. French* (2008) 43 Cal.4th 36, 46 [" '[T]he forfeiture rule ensures that the opposing party is given an opportunity to address the objection, and it prevents a party from engaging in gamesmanship by choosing not to object, awaiting the outcome, and then claiming error.' "]; *Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184-185, fn. 1 [" '[I]t is *unfair to the trial judge and to the adverse party* to take advantage of an error on appeal when it could easily have been corrected at trial' "].)

Trying to circumvent forfeiture, Johnson argues any forfeiture must be the result of ineffective assistance of counsel. We reject this contention.

To show that trial counsel's performance was constitutionally defective, an appellant must prove: (1) counsel's performance fell below the standard of reasonableness, and (2) the "deficient performance prejudiced the defense."

25

(*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 (*Strickland*).) Competency is presumed unless the record affirmatively excludes a rational basis for trial counsel's choice. (*People v. Ray* (1996) 13 Cal.4th 313, 349; *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260.)

"It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

We review trial counsel's performance with deferential scrutiny, indulging a strong presumption it falls within the wide range of reasonable professional assistance, recognizing the many choices attorneys make in handling cases and the danger of second-guessing a trial attorney's decisions. (*People v. Maury* (2003) 30 Cal.4th 342, 389; *Strickland*, *supra*, 466 U.S. at pp. 687-688, 694.)

Johnson's claim of ineffective counsel arises from his trial counsel's failure to make certain objections to Oplinger's testimony during trial. However, in assessing whether counsel's performance was deficient, we must remain mindful that "[a]n attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel." (*People v. Kelly* (1992) 1 Cal.4th 495, 540.) Moreover, we generally defer to the tactical decisions of trial counsel. (See *People v. Scott* (1997) 15 Cal.4th 1188, 1212; *People v. Holt* (1997) 15 Cal.4th 619, 703.)

In the instant matter, there are satisfactory explanations for defense counsel's conduct at trial. As the People suggest, defense counsel might not have objected because he did not want to highlight certain testimony for the

jury. (See *People v. Harris* (2008) 43 Cal.4th 1269, 1290 [no ineffective assistance where counsel might "have decided that objecting would focus the jury's attention . . . in ways that would not be helpful to the defense"].) "Or the jury may have looked bored, and the stimulus of an objection may have awakened the jurors' interest in a counterproductive way." (*People v. Ramirez* (2019) 40 Cal.App.5th 305, 311.)

Yet, this may be the rare case where defense counsel's strategy is clear even on a cold record. Over several hearsay objections by the prosecution, defense counsel cross-examined Oplinger regarding several witness statements. For example, during his cross-examination of Oplinger, defense counsel called into question whether Drew's recollection of where the shooter was on the night in question was consistent with the physical evidence. Moreover, counsel's questions caused Oplinger to reiterate that Drew identified the shooter as a "light-skinned Hispanic male" while she agreed that the location of the shootings was well lit and Drew had good vision.

Johnson's trial counsel also caused Oplinger to reinforce that Richard did not mention that he saw a black man with a gun getting out of a white Monte Carlo when he was interviewed by the police on the night in question. Instead, Richard added this new information only after Oplinger interviewed him over five years later.

In addition, Johnson's trial counsel asked Oplinger about the statements of eyewitness Celestina. Through his cross-examination, counsel caused Oplinger to admit that she wrote in her report, based on Celestina's statement, that two males approached a third male in an aggressive manner and that third male stood his ground.

Defense counsel also made Oplinger testify, again over hearsay objections, that an officer and a sergeant in the police department were

discussing the alleged identification of .22 caliber shells at the crime scene. Yet, there were no .22 caliber shells at the crime scene, and the police had made a mistake.

Johnson's trial counsel also questioned Oplinger about discrepancies between what the Computer Aided Dispatch System (CAD) indicated Antonio had witnessed on the night of the homicides and what Antonio told Oplinger when she interviewed him over five years later.[4]

Counsel additionally emphasized, through the cross-examination of Oplinger, that no homicide detective interviewed Antonio despite him leaving his contact information with the police. He was only interviewed by Oplinger over five years later and, at that time, Oplinger had to remind Antonio of where the shootings occurred. Defense counsel also got Oplinger to admit that Antonio stated that he believed the shootings occurred between 11:00 a.m. and 4:00 p.m. and that he could not recall many of the details of the shootings.

Johnson's trial counsel also cross-examined Oplinger on the content of Will's 911 call. Over a hearsay objection, Oplinger testified that Will described the shooter as "18 to 22 years old," said he saw the shooter leave the scene in a gold SUV, and "seemed excited" on the call. Defense counsel further questioned Oplinger on law enforcement's efforts to track down Will, getting her to admit that a clerk at a service station might have known Will but law enforcement never contacted the clerk to locate Will.

In summary, it appears that Johnson's trial counsel's defense strategy included extensively questioning Oplinger on various witness statements and showing how the statements were inconsistent with each other and the

---

4     The CAD indicated that Antonio had driven by the crime scene and might have seen something. However, Antonio told Oplinger that he had not driven by.

physical evidence.  Through this cross-examination of Oplinger, counsel also challenged the prosecution's narrative that it diligently investigated the homicides.  On this record, Johnson cannot show that his trial counsel's performance fell below the standard of reasonableness.  Because Johnson cannot satisfy the first prong of the *Strickland* test, we need not evaluate his claim of prejudice.[5]

## III

## THE FIREARM ENHANCEMENT

For defendants who personally used firearms in the commission of certain qualifying offenses, section 12022.53 authorizes trial courts to impose various sentence enhancements based on how the defendant used the weapon:  10 years for merely using it; 20 years for intentionally discharging it, and 25 years to life for intentionally discharging it and proximately causing great bodily injury or death.  (§ 12022.53, subds. (b)-(d).)  Although the enhancements used to be mandatory, by the time Johnson was sentenced, the Legislature had amended section 12022.53 to grant trial courts the discretion, "in the interest of justice pursuant to Section 1385 . . . , [to] strike or dismiss an enhancement otherwise required to be imposed . . . ." (§ 12022.53, subd. (h); see Stats. 2017, ch. 682, § 2; § 1385.)

At sentencing, the trial court indicated that it had the authority to strike the gun allegation, but it had "five reasons why [it] thought it should not be stricken."  The court explained, "I never saw any lawful reason for the defendant to be armed before this shooting.  There w[ere] a number of shots,

---

5    The fact that Johnson's trial counsel extensively cross-examined Oplinger on the content of witness statements, including pointing out inconsistencies between them, underscores the need to find forfeiture here.  It would be unfair to the prosecution to allow Johnson to claim error only after his defense counsel's strategy failed to achieve the results he desired.  (See *People v. French*, *supra*, 43 Cal.4th at p. 46.)

the gap in time between the first series and the second series. The testimony of the witness, particularly Keith G[.], was that the defendant shifted his focus from Victim 1 to Victim 2, and he shot Victim 2 in the back."

Subsequently, the trial court reiterated that it understood its discretion to strike Johnson's firearm enhancements but was electing not to do so. The court clarified, "[T]o make the record real clear, I do have the legal authority to strike any or all of the gun allegations under the current law. And I've made a consc[ious] choice not to do that." In response, Johnson's trial counsel argued that there was evidence that the victims were approaching Johnson aggressively and that Johnson was standing his ground. The court clarified that it did consider those facts but "those factors . . . for not striking it completely overwhelm those few factors for striking" the enhancements. In addition, although the court considered running the sentence on count 3 concurrently, it imposed the consecutive upper term for that count, after explaining at length the factors supporting that decision.

Here, Johnson argues the trial court misunderstood that the scope of its discretion was limited to either imposing or striking the 25-to-life enhancement, specifically as to count 3. He maintains the court also had the discretion to substitute one of the less severe enhancements if doing so were in the interests of justice. At the time we originally considered Johnson's argument on this issue, there was a split among the appellate courts regarding whether the superior court was permitted to substitute a less severe, uncharged enhancement. However, that is no longer the case because the California Supreme Court recently resolved this dispute. (See *Tirado, supra*, 12 Cal.5th at p. 692.)

In *Tirado, supra*, 12 Cal.5th 688, our high court noted that the Courts of Appeal had split on the question of whether a trial court has the authority

to strike a greater section 12022.53, subdivision (d) enhancement and impose a lesser, uncharged section 12022.53 enhancement instead, and agreed with the holding in *People v. Morrison* (2019) 34 Cal.App.5th 217 at page 222 (*Morrison*) that trial courts do have such discretion. (*Tirado*, at pp. 696, 701.) In explaining its conclusion, the California Supreme Court applied reasoning somewhat different from that applied in *Morrison*, stating: "When an accusatory pleading alleges and the jury finds true the facts supporting a section 12022.53[, subdivision] (d) enhancement, and the court determines that the section 12022.53[, subdivision] (d) enhancement should be struck or dismissed under section 12022.53[, subdivision] (h), the court may, under section 12022.53[, subdivision] (j), impose an enhancement under section 12022.53[, subdivisions] (b) or (c)." (*Tirado*, at p. 700.) The court reasoned that section 12022.53, subdivision (h) gives trial courts the discretion to strike or dismiss a greater, charged section 12022.53 enhancement and that section 12022.53, subdivision (j) gives them the discretion to impose a lesser, uncharged section 12022.53 enhancement where the accusatory pleading alleged, and the jury found true, the facts supporting such a lesser, uncharged section 12022.53 enhancement. (*Tirado*, at pp. 694-695, 697.) Specifically, the court explained: "Section 12022.53[, subdivision] (j) is the subdivision that authorizes the imposition of enhancements under section 12022.53. It provides that for the penalties in section 12022.53 to apply, the existence of any fact required by section 12022.53[, subdivisions] (b), (c), or (d) must be alleged in the accusatory pleading and admitted or found true." (*Tirado*, at p. 700.) Accordingly, the court determined that a trial court has the discretion to strike a greater, charged section 12022.53 enhancement and impose a lesser, uncharged section 12022.53 enhancement where the facts

31

supporting that lesser enhancement were alleged in the information and found true by the jury.

In the instant action, the People argue that *Tirado* is not instructive because it was clear from the record that the trial court would have declined to impose a lesser included firearm enhancement on counts 1 and/or 2. To this end, the People point out the court's comments that it understood it had discretion to strike the firearm enhancements but "made a [conscious] choice not to do that." Further, the People point out that the court articulated a compelling reason why it would not exercise its discretion to strike the firearm enhancements, and the court sentenced Johnson to the maximum term. However, the court was clearly exercising its discretion in what it believed to be a zero-sum situation- it could either impose the firearm allegation as alleged and found true or strike the entire allegation. What is not evident is whether the trial court was aware that it had discretion to strike the section 12022.53, subdivision (d) enhancements and instead impose lesser, uncharged section 12022.53 enhancements. Because that question cannot be answered on the record before us, we conclude that the appropriate remedy is to remand the matter to the trial court to conduct another resentencing hearing at which it shall exercise its discretion as to whether to strike the section 12022.53, subdivision (d) enhancements and instead impose lesser, uncharged section 12022.53 enhancements, as authorized by *Tirado*. (See *People v. Lua* (2017) 10 Cal.App.5th 1004, 1007 [remand appropriate for court to consider striking some or all enhancements].) We offer no opinion regarding how the trial court should exercise that discretion on remand.

32

IV

CUSTODY CREDITS

Johnson contends the abstract of judgment must be corrected to reflect the accurate number of custody credits. He claims the trial court erred in giving him 867 days total custody credits. Johnson maintains that he was arrested on July 25, 2016 and sentenced on March 18, 2019. As such, he asserts the court should have given him 967 days of custody credits.

The People agree there is a discrepancy in the record as to when Johnson was arrested in this case, and thus, this matter should be remanded to allow the trial court to calculate the correct number of custody credits.[6] We therefore will remand this matter back to the superior court for the purpose of that court calculating the correct amount of presentencing custody credit Johnson should receive. (See *People v. Taylor* (2004) 119 Cal.App.4th 628, 647; *People v. Montalvo* (1982) 128 Cal.App.3d 57, 62.)

DISPOSITION

Johnson's sentence is vacated, and the matter is remanded for resentencing for the limited purpose to allow the trial court to exercise its discretion as to whether to strike the section 12022.53, subdivision (d) enhancements and, instead, impose lesser included enhancements. In addition, the trial court shall correctly calculate the presentence custody credits Johnson should receive and ensure the abstract of judgment reflects

---

[6] In the supplemental respondent's brief, the People note an additional scrivener's error in the abstract of judgment wherein the abstract states the sentences for counts 1 and 2 are to run concurrently, but the court declared at the sentencing hearing that the sentences for count 1 and 2 should run consecutively. The trial court's oral pronouncement controls and cannot be modified by the abstract of judgment. (*People v. Mesa* (1975) 14 Cal.3d 466, 471.) We therefore also order the trial court to correct the abstract of judgment to correctly summarize the oral judgment provided by the court. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185, 188.)

the oral judgment pronounced by the trial court that the sentences for counts 1 and 2 are to run consecutively.  In all other respects, the judgment is affirmed.  The court shall forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.


HUFFMAN, J.

WE CONCUR:



McCONNELL, P. J.



IRION, J.